702 A.2d 230

Vladimir Ivanovich TELNIKOFF

v.

Vladimir MATUSEVITCH.

Misc. No. 3, Sept. Term, 1996.

Court of Appeals of Maryland.

Nov. 10, 1997.

Chasanow, J., dissented and filed opinion.

562

Forrest A. Hainline, III, Washington, DC, for Appellant.

Arnon D. Siegel (Patrick J. Carome, Wilmer, Cutler & Pickering, Guy Miller Struve, Davis Polk & Wardell, on brief), Washington, DC, for Appellee.

Laura R. Handman, (Lankenau Kovner Kurtz & Outten, L.L.P., on brief), Washington, DC, for Amicus Curiae.

Robert D. Balin, on the brief, New York City, for Amicus Curiae.

Argued before MURPHY, C.J.,* and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI,* BELL and RAKER, JJ.

ELDRIDGE, Judge.

The issue presented in this certified question case is whether a particular English libel judgment, under the circumstances presented, is contrary to the public policy of Maryland so that it should be denied recognition under principles of comity.

## I.

Vladimir Matusevitch, now a Maryland resident, was born to parents of Belarusan Jewish descent in New York City in 1936. In 1940, Matusevitch moved to Russia where he remained until 1968 when he defected to Norway and received political asylum. Between 1969 and 1992, Matusevitch worked in several countries as a journalist for Radio Free Europe/Radio Liberty (RFE/RL), a publicly-funded American corporation that broadcasts to listeners in Eastern Europe and countries formerly under Soviet control. Matusevitch presently works at RFE/RL's corporate headquarters in the District of Columbia.

Vladimir Telnikoff, an English citizen, was born in Leningrad in 1937 and remained there until 1971, when he emigrated to Israel. The following year, Telnikoff began working as a freelance writer and broadcaster for the British Broadcasting Corporation (BBC) in London. In 1983, Telnikoff became employed as a journalist at RFE/RL in Munich, Germany.

On February 13, 1984, an article written by Telnikoff was published in the London *Daily Telegraph*, headed "Selecting the Right Wavelength to Tune in 'to Russia." The article stated in pertinent part as follows:

---

* Murphy, C.J., and Karwacki, J., now retired, participated in the hearing and conference of this case while active members of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, they also participated in the decision and the adoption of this opinion.

"But still, after three decades of gradually becoming aware of the significance of Russian language broadcasting, I believe [the BBC's] general concept has never been set right. It continues to reflect the fatal confusion of the West, which has yet to clarify to itself whether it is threatened by Russia or by Communism. We fail to understand that Communism is as alien to the religious and national aspirations of the Russian people as those of any other nation.

"This confusion further manifests itself in the policy of recruitment for the Russian Service. While other services are staffed almost exclusively from those who share the ethnic origin of the people to whom they broadcast, the Russian Service is recruited almost entirely from Russian-speaking national minorities of the Soviet empire, and has something like 10 per cent of those who associate themselves ethnically, spiritually or religiously with Russian people. However high the standards and integrity of that majority there is no more logic in this than having a Greek service which is 90 per cent recruited from the Greek-speaking Turkish community of Cyprus.

"When broadcasting to other East European countries, we recognize them to be enslaved from outside, and better able to withstand alien, Russian, Communism through our assertion of their own national spirit and traditions. However, this approach leaves room for flirting with Euro-communism or 'socialism with a human (non-Russian) face' as a desirable further alternative, and well suits the Left in the West.

"Resisting the ideological advance of Communism by encouraging anti-Russian feelings is of less obvious value with a Russian audience. Making 'Russian' synonymous with 'Communist' alienates the sympathetic Russian listeners. It stirs up social resentment in others against the Russians. Making those word synonymous also makes sympathy for Russian into support for the Communist system."

In response, a letter written by Matusevitch, entitled "Qualifications for Broadcasting to Russia," was published in the

*Daily Telegraph* on February 18, 1984. It was as follows (emphasis in original):

"Sir—Having read 'Selecting the Right Wavelength to Tune in to Russia' (Feb 13) I was shocked, particularly by the part on alleged inadequacies of the BBC's Russian Service recruitment policies.

"Mr. Vladimir Telnikoff says: 'While other services are staffed almost exclusively from those who share the ethnic origin of the people to whom they broadcast, the Russian Service is recruited almost entirely from Russian-speaking national minorities of the Soviet empire.'

"Mr. Telnikoff must certainly be aware that the majority of new emigres from Russia are people who grew up, studied and worked in Russia, who have Russian as their mother tongue and have only one culture—Russian.

"People with Jewish blood in their veins were never allowed by the Soviet authorities to feel themselves equal with people of the same language, culture and way of life. Insulted and humiliated by this paranoiac situation, desperate victims of these Soviet racialist (anti-Semitic) policies took the opportunity to emigrate.

"Now the BBC's Russian Service, as well as other similar services of other Western stations broadcasting to Russia, who are interested in new staff members (natives), employ those people in accordance with common democratic procedures, interested in their professional qualifications and not in the blood of the applicants.

"Mr. Telnikoff demands that in the interest of more effective broadcasts the management of the BBC's Russian Service should switch from *professional testing* to a *blood* test.

"Mr. Telnikoff is stressing his racialist recipe by claiming that no matter how high the standards and integrity 'of ethnically alien' people Russian staff might be, they should be dismissed.

"I am certain the *Daily Telegraph* would reject any article with similar suggestions of lack of racial purity of the writer in any normal section of the British media.

"One could expect that the spreading of racialist views would be unacceptable in a British newspaper." [1]

---

**1.** The *Daily Telegraph* subsequently published Telnikoff's reply letter, entitled "BBC Employment of Russian Broadcasters," on April 13, 1984:

"Sir—I regret the lateness for unavoidable reasons of my response to the letter of Mr. Vladimir Matusevitch (Feb. 18) which completely misconstrued my article about broadcasting to the Soviet Union.

"What I in fact attempt to do is to draw attention to the fatal confusion of the West which has yet to clarify to itself whether it is threatened by Russia or by Communism.

"This lack of understanding nurtures the spread of Communism globally and has shown itself in many failures of the West. To illustrate this confusion in broadcasting terms, I refer to the fact that, contrary to the general recruiting policy of the BBC's External Services, the Russian Service employs only 'something like 10 per cent of those who associate themselves ethnically, spiritually or religiously with Russian people.'

"The price is to hinder that vital meeting of minds whereby we appeal to Russian people, not their Soviet dummies, and without which it is impossible to oppose Communism ideologically.

"From this Mr. Matusevitch concludes that I am 'racialist' and claims that I demand 'the BBC's Russian Service should switch from professional testing to a blood test.'

"To justify the fact that the BBC's Russian Service is almost entirely recruited from Russian speaking national minorities of the Soviet Empire, Mr. Matusevitch says that 'the majority of new emigres from Russia are people who grew up, studied and worked in Russia, who have Russian as their mother-tongue and have only one culture—Russian.'

"Here, he himself, unwittingly, highlights the major misconception of the West concerning *Russian* and *Soviet*. The people he refers to emigrated from the *Soviet Union*, grew up, studied and worked in the *Soviet Union*, and, while retaining their ethnic self, their culture is with rare exception, *Soviet*—which by its definition rejects *Russian* people and their religion.

"Under the circumstances, becoming one of Russian culture, although not impossible, is no easy task, particularly for non-Russian emigres, since its very fabric is woven on the loom of the Russian Church. And yes, those who choose to associate themselves with Russian people may have much to contribute.

"While in my article I had no wish to specify any particular minority involved, Mr. Matusevitch singled out Jewish emigres and tried to present me as anti-Semitic.

After Matusevitch refused to apologize for his February 18th letter, Telnikoff filed a libel action against Matusevitch in the High Court of Justice, Queen's Bench Division, in London. Matusevitch was absent for the trial on October 5, 1988, and judgment was entered against him in the amount of 65,000 pounds. Subsequently, the High Court of Justice set aside the judgment upon a motion by Matusevitch and set a new trial for May 22, 1989.

At the May 22nd trial, Telnikoff argued that the "natural and ordinary" meaning of the words contained in Matusevitch's letter implied that Telnikoff advocated (1) the use of blood-testing as part of the recruitment policy in the BBC Russian Services, (2) the dismissal of employees of the BBC Russian Service on racial grounds, and (3) racial discrimination and anti-semitic behavior. Matusevitch denied that the letter was defamatory and defended on the ground that the letter constituted "fair comment" on a matter of public interest.[2] Matusevitch did not, however, assert truth as a defense.[3] In reply to Matusevitch's "fair comment" defense, Telnikoff asserted that Matusevitch "had been actuated by express

---

"Furthermore, in proclaiming the complete assimilation of this national minority, he is, I believe, well in tune with Soviet policy.
"Surely Jewish emigres will not thank him if he, too, denies them their own national identity."

**2.** Under English law, "fair comment" is an affirmative defense under which a defendant must prove that the alleged libel was "comment," and that the "comment" was objectively "fair" or that it could honestly have been said by an honest person. *See* the discussion later in this opinion, *infra,* Part III D. Matusevitch claimed that his letter was "fair comment" upon a matter of public interest because of "the view expressed by the Plaintiff as to the necessary qualifications for broadcasting to Russia and in particular the alleged inadequacies of the recruitment process of the BBC Russian Service."

**3.** A second affirmative defense under English law is "justification" or "truth." Defamatory words are presumed false, and thus the defendant carries the burden of proving the "truth" of the alleged defamatory words. Because a defendant who pleads but fails to prove truth as a defense may be liable for aggravated damages, Matusevitch chose not to plead truth as a defense.

malice."[4]

At the conclusion of the trial, the High Court of Justice granted Matusevitch's motion for a judgment as a matter of law. Holding that a "reasonable jury" would find that the alleged libel was "comment," the court explained:

"Read in the context of the rest of the letter, I think that [Matusevitch] was doing no more than to make the comments that, if [Telnikoff's] views as stated in his article were given effect to, then the logical outcome would be that the BBC would, when interviewing applicants to join the Russian Service, concentrate on the ethnic origins of the applicant rather than their expertise as broadcasters. I think it is clear that [Matusevitch] was using the suggestion of a blood test in a metaphorical sense and in no way suggesting that [Telnikoff] in his article had actually demanded that a blood sample should be taken from anyone.... Mr. Telnikoff had not demanded in his article that any existing staff should actually be dismissed; but by claiming that 90% of the existing staff were unsuitable for the service, I think it is comment rather than a bare statement of fact to state, as the defendant did in his letter, that Mr. Telnikoff was suggesting that those unsuitable staff should be dismissed."

The High Court went on to rule that Matusevitch's comment was objectively "fair," consisted of "a matter of public interest," and that there was no showing of express malice.[5]

The Court of Appeal affirmed the High Court's judgment on

---

**4.** "Express malice," in the sense of ill-will, spite, or an intent to injure, will under English law, defeat a defense of "fair comment." *See infra,* Part III D.

**5.** At the trial, Telnikoff had argued that the comment was malicious because "Matusevitch's dominant motive [in the letter] ... was to injure [him] and/or to give vent to his personal spite and ill-will towards [him]" and that Matusevitch "published the words complained of with no honest belief as to their truth and/or recklessly, that is to say that he was genuinely indifferent as to their truth or falsity." The court held, however, that "there was no evidence of express malice."

May 16, 1990.[6] Telnikoff appealed to the House of Lords which, on November 14, 1991, affirmed in part, reversed in part and remanded the case. While affirming the rulings below with regard to malice, the House of Lords set aside the holdings below that Matusevitch's letter was "pure comment." Lord Keith of Kinkel for the House of Lords reasoned that, in determining whether the letter was comment or fact, the jury should examine the letter by itself and not in context with Telnikoff's article.[7] Accordingly, the House of Lords remanded the case to the High Court of Justice for a jury to decide "whether paragraphs 6 and 7 of [Matusevitch's] letter consist-

---

**6.** On appeal, the Court of Appeal agreed with the trial court that "Matusevitch's figurative and hyperbolic words were at the very least comment, not fact, whether considered in context with Telnikoff's article or by itself." Lord Justice Lloyd for the court stated:

"Take the statement 'Mr. Telnikoff demands that [the BBC] should switch from professional testing to a blood test.' Contrary to what might appear from the particulars in the statement of claim, [Mr. Telnikoff] concedes that the reference to a blood test is not to be taken literally.... Any fair-minded man reading the letter as a whole would regard it as an inference drawn by the author from the ... letter."

The court then held that the letter was "fair"—that "an honest-minded man might honestly hold the views stated as comments on the facts on which those comments were made," and that there was no malice on Matusevitch's part. Rather, the court concluded that Matusevitch "believed passionately in the evil of anti-semitism.... [H]e and [Telnikoff] were total strangers. In those circumstances no reasonable jury could have held that [Matusevitch's] dominant motive was to injure [Telnikoff], rather than express his own honest if misguided views."

**7.** Lord Keith of Kinkel wrote for the House of Lords as follows:

"In my opinion, the letter must be considered on its own. The readers of the letter must have included a substantial number of persons who had not read the article or who, if they had read it, did not have its terms fully in mind. If to such persons the letter appeared in paras (6) and (7) to contain statements of fact about what the plaintiff had written in his article, which as I have already indicated might well be the case, then in the eyes of those persons the plaintiff would clearly be defamed. The matter cannot turn on the likelihood or otherwise of readers of the letter having read the article. In some cases many readers of a criticism of some subject matter may be familiar with that subject matter but in other cases very few may be, for example, where that subject matter is a speech delivered to a limited audience. The principle must be the same in either case."

ed of pure comment or whether they contained defamatory statements of fact."

On remand, the High Court of Justice instructed the jury on this issue at a trial commencing March 10, 1992.[8] The jury returned a 240,000 pound verdict in favor of Telnikoff, finding that Matusevitch's letter conveyed:

"1. That [Telnikoff] had made statements inciting racial hatred and/or racial discrimination; [and]

2. That [Telnikoff] was a racialist and /or anti-semite and/or a supporter and/or proponent of doctrines of racial superiority or racial purity."

Subsequently, a judgment was entered into Telnikoff's favor for the amount of the jury's verdict.

Telnikoff unsuccessfully attempted to have his judgment enforced against Matusevitch in the United States.[9] On April 20, 1994, Matusevitch commenced the present action by filing a complaint in the United States District Court for the District of Maryland, seeking a declaratory judgment that the English judgment was "repugnant" to the First and Fourteenth Amendments to the United States Constitution, to Article 40

---

8. After a pre-trial hearing, the High Court rejected Matusevitch's amended plea to assert the affirmative defense of "justification" or "truth," relying on the overall delay and the "hardship and anxiety" which a plea of "justification" could present at this stage. The denial was later affirmed by the Court of Appeal.

9. There is some confusion as to the initial procedure by which Telnikoff sought to enforce the judgment in the United States. On December 10, 1993, Telnikoff filed in the Circuit Court for Montgomery County, Maryland, the authenticated English judgment in the amount of $ 370,-800 plus interest. The judgment was recorded in the circuit court's docket book. In April 1994, Telnikoff filed in the Superior Court for the District of Columbia a copy of the docket sheet obtained from the Montgomery County Circuit Court. According to Telnikoff, the docket sheet represented a Maryland "judgment" in his favor. Matusevitch, on the other hand, claims that a "judgment" was never entered against him in Maryland because the filing was improper under Maryland law. The record reveals that, on Matusevitch's motion, the District of Columbia Superior Court dismissed Telnikoff's action on November, 1994. On October 17 1995, Telnikoff and Matusevitch filed in the Circuit Court for Montgomery County a stipulation dismissing the "action" in that court.

of the Maryland Declaration of the Rights, and to Maryland common law and Maryland public policy. Telnikoff counterclaimed, seeking enforcement of his English judgment in Maryland. Upon stipulation by the parties, the case was transferred to the United States District Court for the District of Columbia.

On January 27, 1995, the United States District Court for the District of Columbia entered judgment for Matusevitch, holding that the cause of action underlying the English libel judgment was "repugnant to the public policy of the State" within the meaning of Maryland's Uniform Foreign–Money Judgments Recognition Act, Maryland Code (1974, 1995 Repl. Vol.), § 10–704(b)(2) of the Courts and Judicial Proceedings Article, and that recognition of the foreign judgment under principles of comity "would be repugnant to the public policies of the State of Maryland and the United States." *Matusevitch v. Telnikoff,* 877 F.Supp. 1, 3, 4 (D.D.C.1995). Alternatively, the United States District Court held that recognition and enforcement of the English judgment would violate the First and Fourteenth Amendments to the United States Constitution, *id.* at 4–6.[10]

Telnikoff appealed to the United States Court of Appeals for the District of Columbia Circuit. After hearing oral argument, the United States Court of Appeals certified, pursuant to the Uniform Certification of Questions of Law Act,

---

**10.** In granting summary judgment in Matusevitch's favor, the United States District Court distinguished between English libel law and American libel law in light of First Amendment principles, concluding that the English libel action would have failed in this country. Specifically, the court recognized that "[i]n the United Kingdom, the defendant bears the burden of proving allegedly defamatory statements true" whereas "the law in the United States requires the plaintiff to prove that the statements were false." Moreover, the court explained that "in the United States, courts look to the context in which the statements appeared when determining a First Amendment question" but that the English "judgment was based on jury instructions which asked the jury to ignore context." *Id.* at 4–5. Finally, the court concluded that "since there appears to be no proof that the plaintiff made the statements with actual malice, the plaintiff enjoys the constitutional protection for speech directed against public figures." *Id.* at 5.

Code (1974, 1995 Repl.Vol., 1996 Supp.), §§ 12–601 through 12–609 of the Courts and Judicial Proceedings Article, the following question to this Court:

"Would recognition of Telnikoff's foreign judgment be repugnant to the public policy of Maryland?"

We shall answer the question in the affirmative.

## II.

Telnikoff argues that the English libel judgment is entitled to recognition under principles of "comity." Matusevitch, on the other hand, asserts that the English judgment is repugnant to the public policy of the United States and of Maryland and, therefore, should be denied recognition.

■ The recognition of foreign judgments is governed by principles of comity. *Societe Nat. Ind. Aero. v. U.S. Dist. Court,* 482 U.S. 522, 543 n. 27, 107 S.Ct. 2542, 2555 n. 27, 96 L.Ed.2d 461, 483–484 n. 27 (1987); *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 411–412, 84 S.Ct. 923, 931–932, 11 L.Ed.2d 804, 813–814 (1964); *Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895); *Wolff v. Wolff,* 40 Md.App. 168, 175, 389 A.2d 413, 417 (1978), *aff'd,* 285 Md. 185, 401 A.2d 479 (1979); *In re Honda American Motor Co., Inc.,* 168 F.R.D. 535 (D.Md.1996).

The United States Supreme Court discussed the meaning of comity in *Hilton v. Guyot, supra,* 159 U.S. at 163–164, 16 S.Ct. at 143, 40 L.Ed. at 108, where Justice Gray wrote for the Court:

"No law has any effect, of its own force, beyond the limits of the sovereignty from which its authority is derived. The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call 'the comity of nations.' Although the phrase has been often criticized, no satisfactory substitute has been suggested.

" 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."

*See also Somportex Limited v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3rd Cir.1971) (comity is a principle "of practice, convenience, and expediency. Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws"); *Black's Law Dictionary* 267 (6th ed.1990) (defining "comity" as "the principle in accordance with which the courts of one state or jurisdiction will give effect to the laws and judicial decisions of another, not as a matter of obligation, but out of deference and respect").

■ Although foreign judgments are entitled to a degree of deference and respect under the doctrine of comity, courts will nonetheless deny recognition and enforcement to those foreign judgments which are inconsistent with the public policies of the forum state. *Malik v. Malik*, 99 Md.App. 521, 534, 638 A.2d 1184, 1190 (1994) ("where [a foreign] judgment is ... against public policy ... it will not be given any effect by our courts"). As explained by the Supreme Court in *Hilton v. Guyot, supra*, 159 U.S. at 164–165, 16 S.Ct. at 144, 40 L.Ed. at 109, *quoting* Story, *Conflict of Laws*, § 28,

" '[comity] must necessarily depend on a variety of circumstances which cannot be reduced to any certain rule; that no nation will suffer the laws of another to interfere with her own to the injury of her citizens; that whether they do or not must depend on the condition of the country in which the foreign law is sought to be enforced, the particular nature of her legislation, her policy, and the character of her

institutions; that in the conflict of laws it must often be a matter of doubt which should prevail; and that, whenever a doubt does exist, the court, which decides, will prefer the laws of its own country to that of the stranger.' "

See *Bank of Augusta v. Earle*, 13 Pet. 519, 589, 10 L.Ed. 274, 308 (1839), where Chief Justice Taney pointed out that the "comity thus extended to other nations . . . is the voluntary act of the nation by which it is offered; and is inadmissible when contrary to its policy, or prejudicial to its interests." [11]

The justification for the public policy exception to the recognition of foreign judgments was articulated by the United States Court of Appeals for the District of Columbia Circuit in *Laker Airways v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C.Cir.1984), as follows:

"There are limitations to the application of comity. When the foreign act is inherently inconsistent with the policies underlying comity, domestic recognition could tend either to legitimize the aberration or to encourage retaliation, undercutting the realization of the goals served by comity. No nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum. Thus, from the earliest times, authorities have recognized that the obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act."

See also, e.g., *Andes v. Versant Corp.*, 878 F.2d 147 (4th Cir.1989).

■ The principles underlying comity, including the public policy exception, have been codified in the Maryland Uniform Foreign–Money Judgments Recognition Act, Code (1974, 1995 Repl.Vol.), §§ 10–701 et seq. of the Courts and Judicial Pro-

---

**11.** There are several aspects to the doctrine of "comity" in addition to the matter of whether foreign judgments should be recognized and enforced. There appears, however, to be greater judicial scrutiny of foreign judgments than of other matters falling within the concept of comity. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 408–415, 84 S.Ct. 923, 930–933, 11 L.Ed.2d 804, 812, 816 (1964).

ceedings Article. *See Wolff v. Wolff, supra,* 40 Md.App. at 170–176, 389 A.2d at 413–422; *Guinness PLC v. Ward,* 955 F.2d 875 (4th Cir.1992); *Andes v. Versant Corp., supra,* 878 F.2d at 149–150.

 Section 10–704(b)(2) of the Act specifically states that a "foreign judgment need not be recognized if" the "cause of action on which the judgment is based is repugnant to the public policy of the State. . . ."[12] This provision was recently applied by the United States Court of Appeals for the Fourth Circuit in *Andes v. Versant Corp., supra,* 878 F.2d 147. In that case the Fourth Circuit considered, under the Maryland Foreign Money–Judgments Recognition Act, a judgment based on an English law which precluded a claim of secondary liability against one who was not a party to the litigation against the primary obligor. This law provided the basis for an English judgment holding liable the corporate guarantor of a loan while shielding two secondarily liable parties on the ground that they were not made parties to the English

---

**12.** Specifically, § 10–704 of the Act provides in its entirety as follows:
 "(a) A foreign judgment is not conclusive if:
 (1) The judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law;
 (2) The foreign court did not have personal jurisdiction over the defendant;
 (3) The foreign court did not have jurisdiction over the subject matter; or
 (4) The judgment was obtained by fraud.
 (b) A foreign judgment need not be recognized if:
 (1) The defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable him to defend;
 (2) The cause of action on which the judgment is based is repugnant to the public policy of the State;
 (3) The judgment conflicts with another final and conclusive judgment;
 (4) The proceeding in the foreign court was contrary to an agreement between the parties under which the dispute was to be settled out of court; or
 (5) In the case of jurisdiction based only on personal service, the foreign court was a seriously inconvenient forum for the trial of the action."

proceeding against the primary obligor. Refusing enforcement of the judgment in Maryland, the United States Court of Appeals held that the "English rule of preclusion is so much at odds with normal American notions of litigation that no American jurisdiction would readily embrace it." *Andes v. Versant Corp., supra,* 878 F.2d at 150.[13]

Other recent cases refusing to recognize or enforce foreign judgments or court orders on public policy grounds include, *e.g., Overseas Inns S.A.P.A. v. United States,* 911 F.2d 1146 (5th Cir.1990) (Luxembourg judgment, based upon treating the United States Government as a general creditor rather than a priority creditor, was not entitled to recognition because it was contrary to domestic public policy); *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 715 (2d Cir.1987) (New York law required federal court "to deny enforcement of the London judgment as conflicting with New York's public policy of deferring to foreign [Swedish] bankruptcy proceedings"); *Ackermann v. Levine,* 788 F.2d 830 (2nd Cir.1986) (foreign judgment for attorneys' fees enforced in part and refused enforcement in part); *Laker Airways v. Sabena Belgian World Airlines, supra,* 731 F.2d at 931 ("a state is not required to give effect to foreign judicial proceedings grounded on policies which do violence to its own fundamental interests"); *Stein v. Siegel,* 50 A.D.2d 916, 917, 377

---

**13.** The public policy exception, among other things, distinguishes the recognition of foreign judgments from the recognition of judgments rendered by other jurisdictions within the United States. Under the Full Faith and Credit Clause of the United States Constitution, Article IV, § 1, the latter are afforded recognition if the court rendering the judgment had subject matter jurisdiction and jurisdiction over the persons. *See, e.g., Nevada v. Hall,* 440 U.S. 410, 421, 99 S.Ct. 1182, 1188, 59 L.Ed.2d 416, 425 (1979); *Williams v. North Carolina,* 325 U.S. 226, 229, 65 S.Ct. 1092, 1095, 89 L.Ed. 1577, 1581 (1945); *Roach v. Jurchak,* 182 Md. 646, 650, 35 A.2d 817, 820 (1944); *Coane v. Girard Trust Co.,* 182 Md. 577, 580, 35 A.2d 449, 451 (1944). *See also Broderick v. Rosner,* 294 U.S. 629, 643, 55 S.Ct. 589, 593, 79 L.Ed. 1100, 1107 (1935), where Justice Brandeis for the Court stated: "For the States of the Union, the Constitutional limitation imposed by the full faith and credit clause abolished, in large measure, the general principle of international law by which local policy is permitted to dominate rules of comity."

N.Y.S.2d 580 (1975) (Austrian decree dismissing action and containing a "waiver of claim" refused recognition because "it contravenes the public policy of this State ... that a discontinuance by any method is ordinarily without prejudice to the commencement of a new action"); *Calzaturificio Rangoni S.p.A. v. U.S. Shoe Corp.*, 868 F.Supp. 1414, 1419 (S.D.N.Y. 1994) ("In order to properly accord another sovereign's decision comity, that decision cannot offend the laws of the United States. * * * In this case, according the Italian Judgment comity would offend United States law").

### III.

The question before us is whether Telnikoff's English libel judgment is based upon principles which are so contrary to Maryland's public policy concerning freedom of the press and defamation actions that recognition of the judgment should be denied.

### A.

In resolving this public policy issue, it is important to emphasize what is *not* before this Court. The certified question does not ask us to decide whether the Free Press Clause of the First Amendment or Article 40 of the Maryland Declaration of Rights [14] directly precludes Maryland recognition or enforcement of the English judgment, and we do not decide those issues.[15]

---

14. Article 40 of the Declaration of Rights states:
 **"Article 40. Freedom of press and speech.**
 "That the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege."

15. Although the Constitution of the United States is obviously part of the "Law of the State," *see* Article 2 of the Maryland Declaration of Rights, nevertheless the Maryland Uniform Certification of Questions of Law Act, Code (1974, 1995 Repl.Vol., 1996 Supp.), §§ 12–601 through 12–609 of the Courts and Judicial Proceedings Article, does not authorize this Court to decide questions of federal constitutional law in a

 While we shall rest our decision in this case upon the non-constitutional ground of Maryland public policy, nonetheless, in ascertaining that public policy, it is appropriate to examine and rely upon the history, policies, and requirements of the First Amendment and Article 40 of the Declaration of Rights. In determining non-constitutional principles of law, courts often rely upon the policies and requirements reflected in constitutional provisions. *See, e.g., Kramer v. Bally's Park Place*, 311 Md. 387, 396, 535 A.2d 466, 470 (1988); *Marchesi v. Franchino*, 283 Md. 131, 137–139, 387 A.2d 1129, 1132–1133 (1978); *General Motors Corp. v. Piskor*, 277 Md. 165, 171, 352 A.2d 810, 814–815 (1976); *Dorsey v. State*, 276 Md. 638, 648–659, 350 A.2d 665, 671–678 (1976); *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 591–597, 350 A.2d 688, 694–698 (1976); *Leese v. Baltimore County*, 64 Md.App. 442, 468, 497 A.2d 159, 172, *cert. denied*, 305 Md. 106, 501 A.2d 845 (1985) ("We can conceive of no clearer 'mandate of public policy' than the rights spelled out in the United States constitution"). *See also Watson v. Peoples Security Life Ins. Co.*, 322 Md. 467, 490, 588 A.2d 760, 771 (1991) (Eldridge, J., concurring in part and dissenting in part) ("Although [Article 46 of the Maryland Declaration of Rights] may not directly apply to private employers, it nonetheless establishes a public policy in Mary-

---

certified question case. *See Widgeon v. Eastern Shore Hosp. Center,* 300 Md. 520, 536–537, 479 A.2d 921, 929 (1984); *Merc. Safe Dep. & Tr. Co. v. Purifoy,* 280 Md. 46, 54, 371 A.2d 650, 655 (1977); *Guy v. Director,* 279 Md. 69, 73, 367 A.2d 946, 949 (1977). Moreover, the certification order by the United States Court of Appeals for the District of Columbia Circuit made it clear that the certified question did not include the issue of whether recognition of the English judgment would directly violate the First Amendment.

With regard to Article 40 of the Maryland Declaration of Rights, even if the certified question were construed to encompass the issue of whether Article 40 directly precludes recognition of the judgment, we would decline to answer this issue under the established principle that a court will not decide a constitutional issue when a case can properly be disposed of on a non-constitutional ground. *See, e.g., Professional Staff Nurses v. Dimensions Health Corp.,* 346 Md. 132, 138–139, 695 A.2d 158, 161 (1997); *Insurance Commissioner v. Equitable,* 339 Md. 596, 614, 664 A.2d 862, 871 (1995); *State v. Lancaster,* 332 Md. 385, 404 n. 13, 631 A.2d 453, 463 n. 13 (1993), and cases there cited.

land that an individual should not be subjected to sex-based discrimination"). Similarly, in arriving at non-statutory principles, courts often look to the policies and requirements of statutes. *See, e.g., Kramer v. Bally's Park Place, supra,* 311 Md. at 392–396, 535 A.2d at 468–470; *Kelley v. R.G. Industries, Inc.,* 304 Md. 124, 141–155, 497 A.2d 1143, 1151–1158 (1985); *McCabe v. McCabe,* 210 Md. 308, 314, 318, 123 A.2d 447, 450–451,452 (1956); *Ortland v. County of Tehama,* 939 F.Supp. 1465, 1470 (E.D.Cal.1996).

Consequently, it is appropriate to examine some of the history, policies, and requirements of the free press clauses of the First Amendment and Article 40 of the Declaration of Rights, as well as the present relationship between those provisions and defamation actions in Maryland.[16]

### B.

■ American and Maryland history reflects a public policy in favor of a much broader and more protective freedom of the press than ever provided for under English law.

---

**16.** Judge Chasanow's dissenting opinion in the present case asserts that, because Matusevitch's letter was "prepared and dispatched by a private person," was "published by a newspaper as a letter to the editor," and was allegedly "libelous regardless of whether the newspaper chose to reprint it," "[f]reedom of the press is not implicated" in this case. This Court, however, has accorded to freedom of the press a much wider scope than Judge Chasanow would. Thus, in *Negley v. Farrow,* 60 Md. 158, 176 (1883), the Court stated that "[t]he liberty of the press guaranteed by the Constitution is a right belonging to every one, whether proprietor of a newspaper or not, to publish whatever he pleases, without the license, interference or control of the government ... " The Court went on in *Negley* to indicate that the publication of "any printed matter" implicates the free press clause of "our Bill of Rights." *Ibid.See also Howard Sports Daily v. Public Service Comm.,* 179 Md. 355, 361, 18 A.2d 210, 215 (1941).

Chief Justice Hughes for the Supreme Court in *Lovell v. Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949, 954 (1938), emphasized that "[t]he liberty of the press is not confined to newspapers and periodicals," and that "[t]he press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion."

(1)

Printing was introduced in England in 1476, but the Crown's pervasive control over the press and publications began under the reign of Henry VIII and continued throughout the Tudor period and much of the Stuart period. The control took the form of royal proclamations containing lists of prohibited publications,[17] the granting of monopolies or privileges to certain printers,[18] orders by the Privy Council and investigations by the Council into allegedly seditious statements and publications,[19] decrees and prosecutions by the court of the Star Chamber for "seditious libel,"[20] and a comprehensive licensing system.[21] Under the Star Chamber Decree of June 23, 1586, "[a]ll books (with the exception of law books and books printed by the queen's printer) were required to be licensed by the Archbishop of Canterbury and the Bishop of London. Law books were to be licensed by the Justices." Fredrick Seaton Siebert, *Freedom of the Press in England 1476–1776*, at 61–62 (1952).

Although the King's authority was circumscribed during the early 1640's, and the Star Chamber was abolished in 1641, press censorship continued. Parliament, on June 14, 1643, enacted an ordinance regulating printing, under which "all

17. Distribution or possession of prohibited publications was punishable by fine, imprisonment, or execution. Numerous executions of persons distributing prohibited publications occurred during the sixteenth century. *See* Fredrick Seaton Siebert, *Freedom of the Press in England 1476–1776*, at 45 (1952).

18. *Id.* at 30–40, 64–87, 127–141.

19. "Beginning in 1542 (the date of the first continuous record) the acts of the Council report a long line of proceedings against individuals for 'seditious words,' 'unfitting worddes,' 'unsemely words,' or 'evil opinions.'" *Id* at 29.

20. Id. at 29, 116–126. One historian has pointed out that "[t]he Star Chamber, the judicial offshoot of the Council, was the instrument most frequently employed in the control of the press in the later sixteenth century, but the Privy Council itself frequently interfered." The proceedings were in secret and torture was sometimes used. *Id.* at 29.

21. *Id.* at 47–63, 141–146.

books, pamphlets, and papers were required to be licensed by persons appointed by Parliament and to be entered in the Register at Stationers' Hall." *Id.* at 187. In addition, Parliament regularly took action, usually by a committee, to investigate "obnoxious publications" or "whenever a particularly irritating publication appeared." *Id.* at 189. The suppression of publications continued during the Commonwealth period through various enactments and orders. For example, Cromwell in August 1655 put into effect orders "to suppress and prosecute all unlicensed printers," "to suppress all news-books except those licensed by the Protector or his Council," "to execute the acts suppressing street hawkers," etc. *Id.* at 231.

After the Restoration, both the King by royal proclamations and Parliament acted to control the press. Thus, "one of the first acts of Charles II was to issue a proclamation (13 August 1660) calling in and suppressing two books written by John Milton." *Id.* at 238. The Printing Act of 1662 continued a comprehensive licensing system, and contained numerous other provisions for the regulation of publications. *Id.* at 238–257. *See also* David S. Bogen, *The Origins of Freedom of Speech and Press,* 42 Md. L.Rev. 429, 442–443 (1983); Bernard Schwartz, *Freedom of the Press* 11 (1992).

The Printing Act of 1662 expired by its own terms in 1694, and with its expiration, the English press licensing system ended. As pointed out by this Court over one hundred years ago in *Negley v. Farrow,* 60 Md. 158, 176 (1883),

"[t]he liberty of the press guaranteed by the Constitution [of Maryland] is a right belonging to every one, whether proprietor of a newspaper or not, to publish whatever he pleases, without the license, interference or control of the government, being responsible alone for the abuse of the privilege. It is a right which, from the introduction of the printing press down to the year 1694, did not in England belong to the subject. On the contrary, no one was allowed to publish any printed matter without the license and supervision of the government, and it was against such interference on the part of the government, and in favor of the right

of the citizen, that this provision found its way into our Bill of Rights."

Although the licensing system expired in 1694, and statutory direct prior restraint theoretically ended, the English Government still attempted to control the press. Queen Anne during the period from 1704 through 1714 issued numerous royal proclamations ordering that "the publication of false news or of books of" a particular kind "is to stop." Frederick Seaton Siebert, *Freedom of the Press in England 1476–1776, supra,* at 307. Parliament in 1712, in response to a message from Queen Anne, imposed taxes upon newspapers and advertisements. " 'That the main purpose of these taxes was to suppress the publication of comments and criticisms objectionable to the Crown does not admit of doubt.' * * * [T]hese taxes—commonly called taxes on knowledge—were resisted and evaded for more than a century, and they constituted one of the important factors that aroused the American colonists to protest against taxation for the purposes of the home government." *Baltimore v. A.S. Abell Co.,* 218 Md. 273, 285, 145 A.2d 111, 117 (1958), quoting *Grosjean v. American Press Co.,* 297 U.S. 233, 246, 56 S.Ct. 444, 447, 80 L.Ed. 660, 666 (1936). The control of the press through taxation continued in England well into the nineteenth century. *See* Frederick Seaton Siebert, *Freedom of the Press In England 1476–1776, supra,* at 305–322.

Moreover, the imposition of taxes was not the only method employed in eighteenth century England to suppress publications. Professor Bogen has stated (David S. Bogen, *The Origins of Freedom of Speech and Press, supra,* 42 Md. L.Rev. at 443–444):

"The death of the licensing system ended prior restraints, but it did not signal the end of punishment for speech offensive to the authorities. Prosecutions for seditious libel and proceedings by the House of Commons and the House of Lords against publishers for breach of parliamentary privilege were major vehicles of suppression during the eighteenth century."

The Supreme Court in *Grosjean v. American Press Co.*, *supra*, 297 U.S. at 245, 56 S.Ct. at 447, 80 L.Ed. at 666, made the same point:

> "For more than a century prior to the adoption of the [First] Amendment—and, indeed, for many years thereafter—history discloses a persistent effort on the part of the British government to prevent or abridge the free expression of any opinion which seemed to criticize or exhibit in an unfavorable light, however truly, the agencies and operations of the government."

The signing of the Declaration of Independence, the adoption of state constitutions, and the later ratification of the First Amendment, signaled a major departure from English law and policy concerning free speech and freedom of the press. According to Justice Black for the Court in *Bridges v. California*, 314 U.S. 252, 264–265, 62 S.Ct. 190, 194–195, 86 L.Ed. 192, 204 (1941) (footnotes omitted),

> "to assume that English common law in this field became ours is to deny the generally accepted historical belief that 'one of the objects of the Revolution was to get rid of the English common law on liberty of speech and of the press.' Schofield, *Freedom of the Press in the United States*, 9 Publications Amer. Sociol. Soc., 67, 76.

\* \* \*

> "It cannot be denied, for example, that the religious test oath or the restrictions upon assembly then prevalent in England would have been regarded as measures which the Constitution prohibited the American Congress from passing. And since the same unequivocal language is used with respect to freedom of the press, it signifies a similar enlargement of that concept as well. Ratified as it was while the memory of many oppressive English restrictions on the enumerated liberties was still fresh, the First Amendment cannot reasonably be taken as approving prevalent English practices. On the contrary, the only conclusion supported by history is that the unqualified prohibitions laid down by

the framers were intended to give to liberty of the press, as to the other liberties, the broadest scope that could be countenanced in an orderly society."

(2)

The Second Continental Congress, by resolution adopted in May 1776, recommended that the thirteen colonies adopt new forms of government, and this action precipitated the preparation of the new state constitutions. Virginia adopted the first constitution and declaration of rights, and, by the end of the Revolutionary War, all thirteen states had adopted new constitutions. *See* 1 Bernard Schwartz, *The Bill of Rights: A Documentary History*, 228–250 (1971).

The Maryland Constitution, including its Declaration of Rights, was drafted in August 1776 by a committee of lawyers and was approved on November 3, 1776. According to Professor Bernard Schwartz, the "Maryland Declaration of Rights was much more detailed than its predecessors, containing 42 articles." 1 Bernard Schwartz, *The Bill of Rights: A Documentary History, supra,* at 279.[22]

---

**22.** Although the Maryland Declaration of Rights was not the first such declaration adopted in 1776, Professor Schwartz points out that Maryland in 1639 enacted what "may rightly be considered the first American Bill of Rights." In discussing early colonial history, he explains, (1 Bernard Schwartz, *The Bill of Rights: A Documentary History, supra,* at 67):

"The next step was for the settlers themselves, acting through their elected legislators to go beyond the bare statement in the early Charters that they were entitled to the rights of Englishmen, and begin the process of giving those rights specific content. They did this by the enactment of statutes which sought to define the basic rights to which the colonists were entitled. As such, these statutes were the direct American ancestors of the federal Bill of Rights. The most famous of these statutes was the Massachusetts Body of Liberties, 1641 (*infra* p. 71). It is not however, usually realized that before that law was enacted, the Maryland General Assembly approved the 1639 Act for the Liberties of the People. Elementary though it was, that document may rightly be considered the first American Bill of Rights.

"The 1639 Maryland Act was a product of the struggle for popular government which was a feature of political life in all the colonies. Lord Baltimore, the Proprietor of Maryland, intended the primary

The original Maryland Declaration of Rights did not contain an express freedom of speech clause, but it did contain an express freedom of the press clause, thus underscoring the importance of freedom of the press. Article XXXVIII of the 1776 Declaration of Rights stated:

"That the liberty of the press ought to be inviolably preserved."

The Maryland press clause has been called the "second model," Virginia's being the first, and it was adopted in the constitutions of Delaware, Georgia, and South Carolina. David A. Anderson, *The Origins of the Press Clause*, 30 UCLA L.Rev. 455, 464–465 (1983).

What is apparently the first recorded official application of the Free Press Clause of the Declaration of Rights occurred in early 1777. It was not by this Court, which was not functioning at the time, but by the General Assembly.[23] Accounts of the matter are set forth in Matthew Page Andrews, *History of Maryland: Province and State*, 332–333 (1929), and Lawrence C. Wroth, *A History of Printing in Colonial Maryland*, 136–137 (1922). On February 25, 1777, the *Maryland Journal*, published by William Goddard, printed an anonymous article which amounted to an argument supporting the Tory point of view and recommended the acceptance of a British offer of

---

role in legislation to remain with himself, with the popular Assembly limited to approving laws proposed by him. Assemblies (as Baltimore put it in instructions to his son, Charles) were to be called 'for the giving of the advice, assent and approbation by the freemen to such acts as shall be by us att any time ordayned made and enacted.' The very first Assembly rejected such a restricted role and drew up laws of its own to govern the Colony. By 1639, Baltimore had acceded to the desires of the colonists. The assembly was thus able to vote the 1639 Act for the Liberties of the People on its own initiative."

**23.** Although this Court originated in the mid-seventeenth century, it was re-established after the Revolution by the Constitution of 1776. The colonial Court of Appeals adjourned on May 21, 1776, and its judges never sat again as the Court of Appeals. The appointment of new judges to the re-established Court of Appeals did not occur until 1778. *See* Carroll T. Bond, *The Court of Appeals of Maryland, A History*, 56–63 (1928).

peace terms. Although the article was apparently supposed to be a satirical piece, the Whig Club of Baltimore took it seriously and demanded that Goddard reveal the author's name. When Goddard refused, the members of the Whig Club carried him by force to a meeting of the Club, at which the members ordered Goddard to leave Baltimore City within twenty-four hours, suggesting "that plenty of tar and feathers were within convenient reach." [24] Goddard left Baltimore and traveled to Annapolis where he contacted the Committee of Safety which, in turn, referred him to the newly elected General Assembly. After hearing the matter, the "Committee of Grievances and Court of Justice" of the House of Delegates condemned the Whig Club and declared that the Whig Club proceedings

> "are a manifest violation of the constitution, directly contrary to the Declaration of Rights assented to by the representatives of the freemen of this State, and tend in their consequences (unless timely checked) to the overthrow of all regular government." [25]

Goddard returned to Baltimore where "he brought out his pamphlet, *The Prowess of the Whig Club*, a publication in which he dusted the salt and pepper of derisive irony over the wounds of his opponents." [26] Goddard was again taken before the Club which "reimposed" his "sentence of banishment." [27] The officer of the Whig Club who presided at this "trial" was Commodore James Nicholson, the Commander in Chief of the Continental Navy. Again Goddard went to Annapolis and, represented by Samuel Chase, appeared before the General Assembly. Thereafter the Club's

---

**24.** Matthew Page Andrews, *History of Maryland: Province and State*, 332 (1929).

**25.** *Id.* at 332, quoting Votes and Proceedings of the House of Delegates, March 10, 1777.

**26.** Lawrence C. Wroth, *A History of Printing in Colonial* Maryland, 137 (1922).

**27.** *Ibid.*

"officials received a formal summons to Annapolis, where they were required to apologize at the bar of the House. In addition, pungently phrased resolutions were passed condemning the mob-like action of the members; and Governor Johnson, of the now fully established state, was especially directed to provide the editor ample protection against 'all violence or injury to his person and property.' "[28]

There are many other incidents in Maryland history demonstrating the strength of this State's public policy guaranteeing freedom of the press, although we shall mention only a few more. For example, at the Maryland Convention to ratify the proposed Constitution of the United States, convened at Annapolis from April 21, 1788, through April 29, 1788, the Convention proposed that there be thirteen amendments to the federal constitution, including a clause stating "that the freedom of the press be inviolably preserved." Professor Anderson (David A. Anderson, *The Origins of the Press Clause, supra*, 30 UCLA L.Rev. at 472) has commented on this recommendation as follows:

"The language, an adaption of the press clause of the Maryland Constitution, was not remarkable. The drafting committee, however, added an intriguing, if enigmatic, commentary: 'In prosecutions in the federal courts for libels, the constitutional preservation of this great and fundamental right may prove invaluable.' Whatever the draftsmen meant by this, it is clear that they did not share the view that a guarantee of freedom of the press would not affect seditious libel prosecutions."

*See also* 2 Bernard Schwartz, *The Bill of Rights: A Documentary History, supra*, at 730–738.

Another historical example of Maryland's commitment to freedom of the press is the State's newspaper shield statute, presently codified at Code (1974, 1995 Repl.Vol.), § 9–112 of the Courts and Judicial Proceedings Article. Maryland, in

---

**28.** Matthew Page Andrews, *History of Maryland: Province and State, supra,* at 333.

1896, became the first state in the United States to adopt a newspaper shield statute designed to protect newspersons from being compelled to disclose their sources. Ch. 249 of the Acts of 1896 provided:

"That no person engaged in, connected with or employed on a newspaper or journal shall be compelled to disclose in any legal proceeding or trial, or before any committee of the legislature or elsewhere, the source of any news or information procured or obtained by him for and published in the newspaper on and in which he is engaged, connected with or employed."

By Ch. 113 of the Acts of 1988, the General Assembly significantly broadened the protection of the newspaper shield law so as to (1) protect former newspersons, (2) give protection against compelled disclosure of notes and unpublished data and information as well as sources, and (3) provide that compelled disclosure was not waived by dissemination of a source or of a portion of the confidential data.

Maryland public policy regarding freedom of the press was summarized by Judge Delaplaine for this Court in *Howard Sports Daily v. Public Service Comm.*, 179 Md. 355, 361, 18 A.2d 210, 215 (1941), as follows:

"For many years after the invention of the printing press, the subjects in England were forbidden to publish any printed matter without the license of the government. It was to prevent any such interference that the American patriots incorporated these [free press] provisions in the Federal and State Constitutions. *Negley v. Farrow*, 60 Md. 158, 176. The liberty of the press is a right belonging to every one, whether the proprietor of a newspaper or not, to publish whatever he pleases without the interference of the government. Neither the Federal Government nor the State can adopt any form of previous restraint upon printed publications or their circulation, or take any action which might prevent such free and general discussion of public matters as seems essential to prepare the people for an intelligent exercise of their rights as citizens."

*See also Sigma Delta Chi v. Speaker,* 270 Md. 1, 4, 310 A.2d 156, 158 (1973) ("freedom of the press . . . has been zealously safeguarded in Maryland").

## C.

Despite the very strong public policy in Maryland regarding freedom of the press, the relationship between freedom of the press and defamation actions did not receive a great deal of attention prior to the Supreme Court's opinion in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Occasionally the view was expressed that free press considerations had an impact on defamation actions, such as the commentary at the Maryland Ratifying Convention of April 1788, or in a few opinions by this Court. *See, e.g., Negley v. Farrow, supra,* 60 Md. at 176. Nevertheless, prior to *New York Times Co. v. Sullivan, supra,* and its progeny, numerous English common law principles governing libel and slander actions were routinely applied in Maryland defamation cases without any consideration or mention of the constitutional free press clauses or the strong public policy favoring freedom of the press. *See, e.g., Domchick v. Greenbelt Consumer Services,* 200 Md. 36, 45–49, 87 A.2d 831, 836–838 (1952).

The Supreme Court in *New York Times Co. v. Sullivan,* 376 U.S. at 279–280, 84 S.Ct. at 726, 11 L.Ed.2d at 706, held that the First Amendment

"prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

The Court went on to hold that such malice could not be presumed (376 U.S. at 283–284, 84 S.Ct. at 728, 11 L.Ed.2d at 708–709), that the constitutional standard requires proof having "convincing clarity" (376 U.S. at 285–286, 84 S.Ct. at 729, 11 L.Ed.2d at 710), and that evidence simply supporting a finding of negligence is insufficient (376 U.S. at 287–288, 84

S.Ct. at 730, 11 L.Ed.2d at 711). In *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Supreme Court held that the principles set forth in *New York Times Co. v. Sullivan* were also applicable to the defamatory criticism of "public figures."

The Supreme Court in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974), held that the "actual malice" standard of *New York Times Co. v. Sullivan* did not extend to defamation actions by persons who were neither public officials nor public figures. Nevertheless the Court went on to hold that, in a defamation action by such a private person against a magazine publisher who published an article relating to a matter of public concern, the First Amendment precluded the imposition of liability for compensatory damages without fault. The Court further held that, in such a defamation action, there can be no recovery of presumed or punitive damages without a showing of actual malice, defined as "knowledge of falsity or reckless disregard for the truth." *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at 349, 94 S.Ct. at 3011, 41 L.Ed.2d at 810. Moreover, in discussing the *New York Times Co. v. Sullivan* actual malice standard, the Court in *Gertz* reiterated that a plaintiff must establish actual malice by "clear and convincing proof." 418 U.S. at 342, 94 S.Ct. at 3008, 41 L.Ed.2d at 807. The Court also recognized that the constitutionally required limitations upon defamation actions constituted a "substantial abridgment of the state law right to compensation for wrongful hurt to one's reputation," 418 U.S. at 343, 94 S.Ct. at 3008, 41 L.Ed.2d at 807.

Subsequently, based upon the principles delineated in the *Gertz* opinion, the Court in *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 768–769, 106 S.Ct. 1558, 1559, 89 L.Ed.2d 783, 787 (1986), held "that, at least where a newspaper publishes speech of public concern, a private-figure plaintiff cannot recover damages [in a defamation action] without also showing that the statements at issue are false." The Court stated, 475 U.S. at 776, 106 S.Ct. at 1563, 89 L.Ed.2d at 792,

"that the common law's rule on falsity—that the defendant must bear the burden of proving truth—must . . . fall here

to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages."

The Court continued (475 U.S. at 777, 106 S.Ct. at 1564, 89 L.Ed.2d at 793):

"[T]he need to encourage debate on public issues that concerned the Court in the governmental-restriction cases is of concern in a similar manner in this case involving a private suit for damages: placement by state law of the burden of proving truth upon media defendants who publish speech of public concern deters such speech because of the fear that liability will unjustifiably result."

*See also Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 16, 110 S.Ct. 2695, 2704, 111 L.Ed.2d 1, 16 (1990); *Hustler Magazine v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41, 52 (1988); *Chesapeake Pub. v. Williams,* 339 Md. 285, 295, 661 A.2d 1169 (1995); *Rosenberg v. Helinski,* 328 Md. 664, 675, 616 A.2d 866, 871 (1992), *cert. denied,* 509 U.S. 924, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993).

The Supreme Court has "also recognized constitutional limits on the *type* of speech which may be the subject of state defamation actions. * * * [A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." (Emphasis in original). *Milkovich v. Lorain Journal Co., supra,* 497 U.S. at 16, 20, 110 S.Ct. at 2704, 2706, 111 L.Ed.2d at 16, 18. *See Hustler Magazine v. Falwell, supra,* 485 U.S. at 50, 108 S.Ct. at 879, 99 L.Ed.2d at 48 (public figure could not recover tort damages for an "ad parody offensive to him, and doubtless gross and repugnant in the eyes of most" which was "intended to inflict emotional injury" but "could not reasonably have been interpreted as stating actual facts"); *Letter Carriers v. Austin,* 418 U.S. 264, 286, 94 S.Ct. 2770, 2782, 41 L.Ed.2d 745, 763 (1974) (union newsletter, calling a non-union worker a "scab" and "traitor," was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members towards those who refused to

join," and could not be reasonably viewed as a "factual representation"); *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6, 15 (1970) (statements at a public meeting, reprinted in newspaper articles, and characterizing a real estate developer's negotiating position as "blackmail," could not reasonably be interpreted as charging the developer with the commission of a criminal offense, but "the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable"); *Capital–Gazette Newspapers v. Stack*, 293 Md. 528, 541, 445 A.2d 1038, 1045, *cert. denied*, 459 U.S. 989, 103 S.Ct. 344, 74 L.Ed.2d 384 (1982) ("under the circumstances, the allegedly false defamatory editorial statement was 'no more than rhetorical hyperbole,' *Greenbelt*, 398 U.S. at 14, 90 S.Ct. at 1542, often present in vehement debate").

 In a series of opinions after *New York Times Co.* and *Gertz*, this Court substantially changed the Maryland common law regarding defamation actions even in areas where the changes were not mandated by the First Amendment and Article 40 of the Maryland Declaration of Rights.[29] *See Marchesi v. Franchino, supra*, 283 Md. 131, 387 A.2d 1129; *General Motors Corp. v. Piskor, supra*, 277 Md. 165, 352 A.2d 810; and particularly *Jacron Sales Co. v. Sindorf, supra*, 276 Md. 580, 350 A.2d 688.

In *Jacron*, with respect to defamation actions by persons who were not public officials or public figures, "we conclude[d] as a matter of state law that the *Gertz*" principles should apply regardless of whether the alleged defamatory statement involved a subject of public concern and regardless of whether the action was against a media defendant or a non-media defendant. 276 Md. at 592, 594, 350 A.2d at 695. Consequently, we held that there could be no recovery without fault in any defamation action. Where the plaintiff was a public

---

**29.** Under the Maryland Constitution, this Court has authority to change common law principles. *See Owens–Illinois v. Zenobia*, 325 Md. 420, 469–470, 601 A.2d 633, 657–658 (1992), and cases there cited.

official or public figure, he or she was required to establish, by clear and convincing evidence, actual malice as defined in *New York Times Co. v. Sullivan.* In all other defamation actions, the plaintiff must by a preponderance of the evidence establish that the defendant was at least negligent. 276 Md. at 596–597, 350 A.2d at 697–698. We also held in *Jacron* that, in all defamation actions, "truth is no longer an affirmative defense to be established by the defendant, but instead the burden of proving falsity rests upon the plaintiff," 276 Md. at 597, 350 A.2d at 698. Furthermore, we held that in all defamation actions, "neither presumed nor punitive damages" may be recovered "unless [the plaintiff] establishes liability under the more demanding New York Times standard of knowing falsity or reckless disregard for the truth." 276 Md. at 601, 350 A.2d at 700.[30] Finally, we indicated that in any defamation case where the defamatory statement enjoys a conditional privilege, the plaintiff must prove actual malice to overcome the conditional privilege. 276 Md. at 599–601, 350 A.2d at 699–700.

This Court in *General Motors Corp. v. Piskor, supra,* 277 Md. at 171, 352 A.2d at 814–815, reiterated the holdings set forth in *Jacron.* In addition, we reversed the judgment in favor of the plaintiff for compensatory and punitive damages because "the trial of the defamation claim . . . proceeded on the premise of liability without fault," 277 Md. at 172, 352 A.2d at 815, and because the punitive damages claim was not submitted to the jury under "the *New York Times* standard of knowing falsity or reckless disregard for the truth." 277 Md. at 175, 352 A.2d at 817.

In *Marchesi v. Franchino, supra,* 283 Md. at 138–139, 387 A.2d at 1133–1134, we held that the "actual malice" required to overcome a conditional privilege in a defamation action was "knowledge of falsity or reckless disregard for truth." The

---

**30.** The issue is now pending in another case before this Court of whether, in light of subsequent developments in the Maryland law of punitive damages, punitive damages can be recovered in a defamation action based on "reckless disregard for the truth."

court held that "malice" in the sense of "ill-will" was an insufficient basis for overcoming a conditional privilege or for awarding punitive damages in any defamation action.

Also pertinent to the issue in the case at bar are this Court's holdings that alleged defamatory language cannot be considered in isolation but must be viewed in the context in which it is used. *See, e.g., Chesapeake Pub. v. Williams, supra,* 339 Md. at 295, 661 A.2d at 1174; *Batson v. Shiflett,* 325 Md. 684, 723, 602 A.2d 1191, 1210 (1992). *See also Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (holding that a determination of whether the alteration of a quotation concerning the subject of an interview constituted "actual malice" was dependent on the context of the interview).

## D.

The contrast between English standards governing defamation actions and the present Maryland standards is striking. For the most part, English defamation actions are governed by principles which are unchanged from the earlier common law period. *See, e.g.,* Bruce W. Sanford, *Libel and Privacy,* § 2.2.2 (2nd ed. 1996 Supp.); Rodney A. Smolla, *Law of Defamation,* § 1.03[3] (1996) ("Modern British libel law has changed very little from its original common law roots"); *Blackshaw v. Lord,* [1984] 1 QB 1, [1983] 2 All ER 311 [1983] 2 WLR 283.

Thus, under English defamation law, it is unnecessary for the plaintiff to establish fault, either in the form of conscious wrongdoing or negligence. The state of mind or conduct of the defendant is irrelevant. *Duncan & Neill on Defamation,* § 18.22, at 133 (2d ed. 1983) ("[T]he honest belief by the defendant in the truth of what he published does not ... provide any defence to an action for defamation"); Rodney A. Smolla, *Law of Defamation, supra,* at § 1.03[3] ("The British cause of action for defamation remains a strict liability tort in which publishers may be held liable even for statements that

were honestly believed to be true, and published without negligence").

Moreover, under English law, defamatory statements are presumed to be false unless a defendant proves them to be true. *Duncan and Neill on Defamation, supra,* § 11.04, at 51 ("The law presumes that defamatory words are false and the plaintiff need do no more than prove that defamatory words have been published of him by the defendant; it is for the defendant to prove that the words are true, if he can"); *Gatley on Libel & Slander,* ch.1, at 6 (7th ed. 1974) ("The law presumes in the plaintiff's favor that the words are false, unless and until the defendant proves the contrary"); Rodney A. Smolla, *Law of Defamation, supra,* at § 1.03[3]. In addition, a defendant risks punitive damages if he pleads truth but fails to prove it. *See, e.g., Cassell & Co, Ltd. v. Broome,* [1972] AC 1027, [1972] 1 All ER 801, [1972] 2 WLR 645 (English House of Lords assessing punitive damages against defendant for failure to prove defamatory statement true).[31]

In England, a qualified privilege can be overcome without establishing that the defendant actually knew that the publication was false or acted with reckless disregard of whether it was false or not. It can be overcome by proof of "spite or ill-will or some other wrong or improper motive." Peter F. Carter–Ruck, *Libel and Slander,* 137 (1973). English law authorizes punitive or exemplary damages under numerous circumstances in defamation actions; unlike Maryland law, they are not limited to cases in which there was actual knowledge of the falsehood or reckless disregard as to truth or falsity. *Id.* at 172–173. Furthermore, as one scholar has pointed out, *id.* at 172,

"[i]n practice only one sum is awarded and it is impossible to tell to what extent the damages awarded in any particular case were intended to be compensatory and to what extent exemplary or punitive. The very high damages awarded in recent years in actions against newspapers can only be

---

**31.** The publication of a libel is also a misdemeanor under the Libel Act of 1843. *See* John F. McEldowney, *Public Law,* 580 (1994).

explained on the basis that the sums awarded reflect the juries' opinion of the defendants' conduct."

English defamation law presumes that a statement is one of fact, and the burden is on the defendant to prove "fair comment." According to one English writer (Peter F. Car-ter–Ruck, *Libel and Slander, supra,* at 118),

"[f]or the defence of fair comment to succeed it must be proved that the subject matter of the comment is a matter of legitimate public interest; that the facts upon which the comment is based are true; and that the comment is fair in the sense that it is relevant to the facts and in the sense that it is the expression of the honest opinion of the writer or speaker."

Proof of malice, in the sense of ill-will, spite, etc., "will vitiate fair comment as a defense event though in all other respects the comment fulfils the qualifications which the law stipulates." *Id.* at 126. In addition, "the malice of one defendant will destroy the defence for all the defendants and each defendant is not entitled to have his case considered separately." *Id.* at 127. Moreover, as the opinion of the House of Lords in the present controversy shows, a statement is not evaluated in the context of the publication to which it responds. *Matusevitch v. Telnikoff* [1991] 4 ALL ER 817, 822–826. Context appears to be eliminated from a court's determination of whether a statement is considered fact or comment.

Finally, English defamation law flatly rejects the principles set forth in *New York Times Co. v. Sullivan, supra,* and *Gertz v. Robert Welch, Inc., supra.* The basic rules are the same regardless of whether the plaintiff is a public official, public figure, or a private person, regardless of whether the alleged defamatory statement involves a matter of public concern, and regardless of the defendant's status. As Professor Smolla has observed (Rodney A. Smolla, *Law of Defamation, supra,* at 1.03[3] ),

"British law recognizes no special protection for defamation actions arising from critiques of public figures or public officials, routinely imposing large damages awards in cases

involving what American courts would characterize as core political discourse."

*See also Bennett and others v. Guardian Newspapers Limited*, [1995] QB (28 December 1995) ("My conclusion is that the persuasive overseas authorities [cited by plaintiff] do not convince me that on their account the *Sullivan* doctrine should be adopted by our courts"); *Derbyshire County Council v. Times Newspapers Limited* [1993] AC 534, [1993] 1 All ER 1011 ("the American law of libel, including as it does no protection for the individual politician as well as political institution, goes further along the road of freedom of the press than the English law").

### E.

A comparison of English and present Maryland defamation law does not simply disclose a difference in one or two legal principles. *Cf. Kramer v. Bally's Park Place, supra*, 311 Md. at 390, 535 A.2d at 467, and cases there cited. Instead, present Maryland defamation law is totally different from English defamation law in virtually every significant respect. Moreover, the differences are rooted in historic and fundamental public policy differences concerning freedom of the press and speech.

The stark contrast between English and Maryland law is clearly illustrated by the underlying litigation between Telnikoff and Matusevitch. Telnikoff, an employee of the publicly funded Radio Free Europe/Radio Liberty, was undisputably a public official or public figure. In this country, he would have had to prove, by clear and convincing evidence, that Matusevitch's letter contained false statements of fact and that Matusevitch acted maliciously in the sense that he knew of the falsity or acted with reckless disregard of whether the statements were false or not. The English courts, however, held that there was no evidence supporting Telnikoff's allegations that Matusevitch acted with actual malice, either under the *New York Times Co. v. Sullivan* definition or in the sense of ill-will, spite or intent to injure. Despite the absence of actual malice under any definition, Telnikoff was allowed to recover.

He was not even required to prove negligence, which is the minimum a purely private defamation plaintiff must establish to recover under Maryland law.

In addition, Telnikoff was not required to prove that Matusevitch's letter contained a false statement of fact, which would have been required under present Maryland law. Instead, falsity was presumed, and the defendant had the risky choice of whether to attempt to prove truth. Furthermore, Telnikoff did not have to establish that the alleged defamation even contained defamatory statements of fact; the burden was upon the defendant to establish that the alleged defamatory language amounted to comment and not statements of fact.

Finally, contrary to the decisions of the Supreme Court and this Court, Matusevitch's letter was not examined in context but in isolation. It must be remembered that Telnikoff began the public debate with his published article, and Matusevitch's letter constituted his rebuttal. Undoubtedly, in this country, under opinions such as *Hustler Magazine v. Falwell, supra,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41, *Letter Carriers v. Austin, supra,* 418 U.S. at 286, 94 S.Ct. at 2782, 41 L.Ed.2d at 763, and *Greenbelt Cooperative Publishing Ass'n v. Bresler, supra,* 398 U.S. at 14, 90 S.Ct. at 1542, 26 L.Ed.2d at 15, Matusevitch's alleged defamatory language would, as a matter of law, be treated as "rhetorical hyperbole" in the course of rebuttal during a vigorous public debate. An apt description of what would have happened in Maryland to Telnikoff's libel suit was set forth by this Court ninety-five years ago (*Shepherd v. Baer,* 96 Md. 152, 156, 159, 53 A. 790, 791, 792 (1902)): " 'A man who commences a newspaper war cannot subsequently come to the Court to complain that he has had the worst of it.' * * * [T]he article [in response] . . . does not exceed the bounds of legitimate self-defense ."

The principles governing defamation actions under English law, which were applied to Telnikoff's libel suit, are so contrary to Maryland defamation law, and to the policy of freedom of the press underlying Maryland law, that Telnikoff's judgment should be denied recognition under principles of

comity. In the language of the Uniform Foreign–Money Judgments Recognition Act, § 10–704(b)(2) of the Courts and Judicial Proceedings Article, Telnikoff's English "cause of action on which the judgment is based is repugnant to the public policy of the State . . . ."

The only American case which the two parties have called to our attention, which is directly on point, reached a similar conclusion. In *Bachchan v. India Abroad Publications*, 154 Misc.2d 228, 585 N.Y.S.2d 661 (1992), an Indian national brought a libel action in the High Court of Justice in London against the New York operator of a news service which transmitted stories exclusively to India. The suit was based upon an article, written by a London reporter and transmitted by the defendant to India, in which the plaintiff's name was used in connection with an international scandal. After a jury assessed 40,000 pounds in damages against the defendant, the plaintiff sought to enforce the judgment against the defendant in New York. The defendant opposed recognition of the judgment on the ground that the judgment was "repugnant to public policy" of New York as embodied in the First Amendment to the United States Constitution and the free speech and press guarantees of the New York Constitution. After contrasting English with American defamation law, the court concluded (154 Misc.2d at 235, 585 N.Y.S.2d at 664):

"It is true that England and the United States share many common-law principles of law. Nevertheless, a significant difference between the two jurisdictions lies in England's lack of an equivalent to the First Amendment to the U.S. Constitution. The protection to free speech and the press embodied in that amendment would be seriously jeopardized by the entry of foreign libel judgments granted pursuant to standards deemed appropriate in England but considered antithetical to the protections afforded the press by the U.S. Constitution."

The decision in *Bachchan* is consistent with principles adopted by the United States District Court for the District of Hawaii in *DeRoburt v. Gannett Co., Inc.*, 83 F.R.D. 574 (D.Hawai'i 1979). There, the issue involved the appropriate

choice of law in a libel action brought in Hawaii by the President of Nauru against an American publisher and its subsidiary in Guam. Because Hawaii had not yet adopted a choice of law rule for defamation cases, the plaintiff urged the court to apply the English common law of Nauru under the rule of *lex loci delicti.* 83 F.R.D. at 577. The court rejected the plaintiff's argument, deciding instead to adopt a rule that recognized both "the interests of the affected parties" and the "relevant policies of the forum." *Id.* at 578, 579. Ultimately, the court held that the law of Nauru should only apply insofar as it was consistent with First Amendment principles. The court reasoned (83 F.R.D. at 579–580):

> "It is the policy of the forum state and Guam that critics of public officials and public figures receive the protection afforded by the First Amendment. The importance of this policy cannot be overstated. It is a principle fundamental to our system of constitutional democracy 'that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' To insure the vigorous, candid and unfearing disclosure of information concerning public officials, the Supreme Court held that the alleged defamer of a public official enjoys the constitutional protection of the 'actual malice' standard which requires a public official suing for defamation to show that an allegedly defamatory remark relating to his official conduct was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.' ... The English common law of libel adopted by Nauru contains no such safeguards...."

*See also Desai v. Hersh,* 719 F.Supp. 670 (N.D.Ill.1989), *aff'd,* 954 F.2d 1408 (7th Cir.1992) (holding that the First Amendment applied extraterritorially to preclude a public figure plaintiff from recovering based upon the publication in India of a book involving United States foreign policy).

Moreover, recognition of English defamation judgments could well lead to wholesale circumvention of fundamental public policy in Maryland and the rest of the country. With

respect to the sharp differences between English and American defamation law, Professor Smolla has observed (Rodney A. Smolla, *Law of Defamation, supra,* at § 1.03[3] ):

> "This striking disparity between American and British libel law has led to a curious recent phenomenon, a sort of balance of trade deficit in libel litigation: Prominent persons who receive bad press in publications distributed primarily in the United States now often choose to file their libel suits in England. London has become an international libel capital. Plaintiffs with the wherewithal to do so now often choose to file suit in Britain in order to exploit Britain's strict libel laws, even when the plaintiffs and the publication have little connection to that country."

*See also* Geoffrey Robertson Q.C. & Andrew Nicol, *Media Law,* 65 (3d ed. 1992) ("British libel law is so notoriously favorable to plaintiffs that an increasing number of forum-shopping foreigners are taking action in London against newspapers and books that are printed, and mainly circulated, abroad"); Bruce W. Sanford, *Libel and Privacy, supra,* at § 2.2 ("The need for familiarity with English libel law has increased with greater use of news material beyond national boundaries, forum shopping by internationally prominent libel plaintiffs, and the arrival of multi-million dollar damage awards in England").

"At the heart of the First Amendment," as well as Article 40 of the Maryland Declaration of Rights and Maryland public policy, "is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *Hustler Magazine v. Falwell, supra,* 485 U.S. at 50, 108 S.Ct. at 879, 99 L.Ed.2d at 48. The importance of that free flow of ideas and opinions on matters of public concern precludes Maryland recognition of Telnikoff's English libel judgment.

*CERTIFIED QUESTION ANSWERED IN THE AFFIRMATIVE. APPELLANT VLADIMIR TELNIKOFF TO PAY COSTS.*

CHASANOW, Judge, dissenting.

The question certified to us by the United States Court of Appeals for the District of Columbia Circuit may have been the result of a misunderstanding during arguments before that court. The certification order states: "Both parties agreed at oral argument that whether recognition and enforcement of the foreign judgment would be repugnant is determined by reference to Maryland law." In their arguments before this Court, however, both counsel indicated that they did not desire certification of any Maryland public policy issue and that the primary issue in the instant case was whether the First Amendment to the United States Constitution and the public policy underlying the United States Constitution precluded enforcement of the foreign judgment. Neither party contended, nor even suggested, that the Maryland Constitution and Maryland public policy should not be read in *pari materia* with the United States Constitution and its underlying public policy. There are both statutory and policy reasons why the issue of Maryland public policy is not relevant and why this Court should respectfully decline to answer the certified question.

On December 10, 1993, Vladimir Telnikoff filed an action in Maryland seeking to have his English libel judgment against Vladimir Matusevitch recognized and enforced.[1] Telnikoff also filed to enforce the judgment in the Superior Court for the District of Columbia, perhaps because Vladimir Matusevitch worked in the District of Columbia, and his wages might

---

**1.** Telnikoff's attorney filed a "Declaration of Counsel Registering Foreign Judgment" stating that the declaration was "pursuant to Maryland Code §§ 11–801 et seq., the Maryland Uniform Enforcement of [Foreign] Judgments Act." Had Telnikoff's libel judgment been rendered in a state or federal court, the filing under Maryland Code (1974, 1995 Repl.Vol.), Courts and Judicial Proceedings Article, §§ 11–801 et seq. would have been proper. Since the judgment was from a foreign country, however, Maryland law requires that the judgment be recognized under the Maryland Uniform Foreign Money–Judgments Recognition Act, Md.Code (1974, 1995 Repl.Vol.), Courts and Judicial Proceedings Art., §§ 10–701 et seq. Because Telnikoff failed to get recognized first under §§ 10–701 et seq., filing under §§ 11–801 et seq. was improper.

be garnished there. Matusevitch then filed a declaratory judgment action in the United States District Court for the District of Maryland, reciting that Telnikoff was seeking recognition and enforcement of his libel judgment in Maryland and the District of Columbia, and Matusevitch asked for a declaration that recognition and enforcement of the English libel judgment would violate the Constitution and public policy of the United States and the Constitution and public policy of the State of Maryland. A stipulation was filed in the Superior Court case that "Mr. Matusevitch and Mr. Telnikoff will take all necessary steps to transfer the action styled *Matusevitch v. Telnikoff,* Civil Action No. L–94–1037 (D.Md.), from the United States District Court for the District of Maryland to the United States District Court for the District of Columbia." This was soon thereafter accomplished by a joint request for a transfer.

Following a hearing in the United States District Court for the District of Columbia, a scholarly opinion was rendered by Judge Ricardo M. Urbina. That opinion was reported as *Matusevitch v. Telnikoff,* 877 F.Supp. 1 (D.D.C.1995). Judge Urbina made several findings, the first was that the Maryland entry of judgment based on the English libel judgment was invalid for *procedural* reasons. *Matusevitch,* 877 F.Supp. at 3. Judge Urbina reasoned that pursuant to the Maryland Uniform Foreign Money–Judgments Recognition Act, Maryland Code (1974, 1995 Repl.Vol.), Courts and Judicial Proceedings Article, § 10–703, "before a party can enforce a foreign-country judgment, the Recognition Act requires a proceeding to determine preliminarily whether the court should recognize the foreign-country judgment." *Matusevitch,* 877 F.Supp. at 2. The judge held that, since this procedure was not complied with, the Maryland judgment was unenforceable. He stated: "[Telnikoff] never attempted to get [the English libel] judgment recognized before filing, as required by statute. Consequently, the court determines that the defendant currently holds an unrecognized foreign-country judgment from the State of Maryland. The defendant must obtain recognition of this judgment in order to enforce it." *Matusevitch,* 877

F.Supp. at 3. The District Court judge further concluded that the English libel judgment violated the public policy of the United States and the State of Maryland. It is abundantly clear that this holding was based solely on the United States Constitution and its underlying policy which Maryland would be obligated to follow. Judge Urbina extensively analyzed Article I and federal case law, but did not cite or rely on a single Maryland case. He read Maryland's public policy as embracing U.S. libel standards and wrote: "libel standards *that are contrary to U.S. libel standards* would be repugnant to the public policies of the State of Maryland and the United States." *Matusevitch*, 877 F.Supp. at 4 (emphasis added). Telnikoff appealed Judge Urbina's decision to the United States Court of Appeals for the District of Columbia Circuit. The sole basis for the appeal was the United States Constitution and federal public policy issue. Telnikoff did not cite or rely on a single Maryland case.

## THE STATUTORY REASON WHY THE CERTIFIED QUESTION SHOULD NOT BE ANSWERED

Both parties obviously agreed with Judge Urbina's finding that the Maryland judgment was invalid for procedural reasons; they took steps to expunge the Maryland judgment and with it any issue involving Maryland public policy. As a result of Judge Urbina's decision and before appellate briefs were filed, the parties jointly secured an order from the Circuit Court for Montgomery County dismissing the Maryland judgment. That order not only recites that Telnikoff voluntarily dismisses the Maryland proceeding but further, by agreement of the parties, orders that neither party will cite nor rely on the expunged Maryland judgment. The Circuit Court for Montgomery County order further provides:

> "Mr. Telnikoff shall not assert in any pending or future action or proceeding in any forum or otherwise base any claim or defense in any forum on the premise that he now holds or at any time has held a judgment of the State of Maryland in his favor and against Mr. Matusevitch or that such judgment now exists or at any time has existed."

The circuit court's dismissal order as well as the pleadings in the pending Superior Court proceedings were filed as part of the record in the federal appellate court. It is beyond question that the Maryland judgment was expunged and along with it any issue of Maryland public policy. The only pending action for recognition of the English libel judgment is the District of Columbia Superior Court action, and since there is no Maryland judgment or proceedings pending, Maryland public policy has no more relevancy than the public policy of Tennessee, Oregon, or any other state where the English judgment might later be filed.

Maryland Code (1974, 1995 Repl.Vol., 1997 Supp.), Courts and Judicial Proceedings Art., § 12–603 provides:

> "The Court of Appeals of this State may answer a question of law certified to it by a court of the United States or by an appellate court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State."

As a result of the expungement of the Maryland judgment, there is no Maryland public policy issue. Since there is currently no Maryland judgment based on the English judgment, Maryland public policy cannot be "determinative" of any issue still pending in the federal litigation and is no more relevant than the public policy of any of the fifty states where the judgment might be filed. Thus, our statute would seem to preclude us from answering this certified question.

## OTHER REASONS FOR NOT ANSWERING THE CERTIFIED QUESTION

This Court cannot "decide questions of federal constitutional law in a certified question case." 347 Md. 561, 578–79 n. 15, 702 A.2d 230, 239 n. 15 (1997). We also have discretion to refuse to answer a certified question, and we should exercise that discretion in the instant case. Maryland Code (1974, 1995 Repl.Vol., 1997 Supp.), Courts and Judicial Proceedings Art.,

§ 12–607 provides: "The Court of Appeals of this State, acting as a receiving court, shall notify the certifying court of acceptance or rejection of the question and, in accordance with notions of comity and fairness, respond to an accepted certified question as soon as practicable." In accordance with notions of comity, fairness, and uniformity, the issues, in the instant case, should be resolved pursuant to the First Amendment and national public policy, not based on Maryland public policy.

Both sides agreed in oral argument that they view this case as being controlled by the First Amendment and its public policy. In addition, this Court's view of Maryland public policy seems to be more restrictive than the First Amendment and its public policy and, if so, Maryland public policy should yield to federal public policy. The majority states that "[i]n a series of opinions after *New York Times Co. [v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)] and *Gertz [v. Robert Welch, Inc.,* 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974)], this Court substantially changed the Maryland common law regarding defamation actions even in areas where the changes were not mandated by the First Amendment. . . ." 347 Md. at 593, 702 A.2d at 246 (citations omitted). If Maryland public policy protects defamation "in areas where the changes were not mandated by the First Amendment," it should be subordinated to the First Amendment policy in this federal declaratory judgment case.

National public policy regarding foreign money-judgments is manifested in the Uniform Foreign Money–Judgments Recognition Act (the Act). The Act contains two important provisions that indicate why we should not answer this certified question. First, the Act indicates that uniformity of interpretation among the states is a primary consideration; and second, the Act permits a state to recognize a foreign judgment even if the judgment is contrary to the state's public policy. In other words, the Act gives a state discretion to subordinate its own public policy in favor of uniformity and the importance of comity among nations. The majority ignores these two important provisions of the Act.

Section 10–708 of the Act, Uniformity of Interpretation, provides: "This subtitle shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of the states which enact it." Md.Code (1974, 1995 Repl.Vol.), Courts and Judicial Proceedings Art., § 10–708. The importance of uniformity in recognition of foreign judgments under the Act was commented on in *Wolff v. Wolff,* 40 Md.App. 168, 389 A.2d 413 (1978), *aff'd,* 285 Md. 185, 401 A.2d 479 (1979):

> "Thus the Uniform Foreign Money–Judgments Recognition Act was intended to promote principles of international comity by assuring foreign nations that their judgments would, under certain well-defined circumstances, be given recognition by courts in states which have adopted the Uniform Act. As reciprocity is generally an important consideration in determining whether the courts of one country will recognize the judgments of the courts of another, the certainty of recognition of those judgments provided for by the Act will hopefully facilitate recognition of similar United States' judgments abroad." (Citations omitted).

40 Md.App. at 175, 389 A.2d at 417. When Maryland's public policy differs from that of other states and from national public policy, then Maryland's public policy should yield to the uniform national public policy. This is further provided for in the Act by authorizing a state to enforce a foreign money judgment, even if the judgment was rendered contrary to the public policy of the enforcing state. The pertinent provision is Md.Code (1974, 1995 Repl.Vol.), Courts and Judicial Proceedings Art., § 10–704, which provides:

> "(a) A foreign judgment is not conclusive if:
>
> (1) The judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law;
>
> (2) The foreign court did not have personal jurisdiction over the defendant;
>
> (3) The foreign court did not have jurisdiction over the subject matter; or
>
> (4) The judgment was obtained by fraud.

(b) A foreign judgment *need not be recognized* if:

(1) The defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable him to defend;

(2) *The cause of action on which the judgment is based is repugnant to the public policy of the State;*

(3) The judgment conflicts with another final and conclusive judgment;

(4) The proceeding in the foreign court was contrary to an agreement between the parties under which the dispute was to be settled out of court; or

(5) In the case of jurisdiction based only on personal service, the foreign court was a seriously inconvenient forum for the trial of the action." (Emphasis added.)

Md.Code (1974, 1995 Repl.Vol.), Courts and Judicial Proceedings Art., § 10–704.

Thus, the Act provides four mandatory reasons why a judgment cannot be recognized and five discretionary reasons why a state may refuse to recognize a foreign judgment. See *Ingersoll Mill. Mach. Co. v. Granger*, 833 F.2d 680, 688 (7th Cir.1987) stating:

"The language of subparagraph (b) [of the Uniform Foreign–Money Judgments Act] is not mandatory, but rather optional. In other words, even if Ingersoll's arguments with respect to the [public policy] provisions of subparagraph (b) were valid, the statute does not require the district court to deny recognition of the judgment; it simply provides that it 'may' deny recognition of the judgment."

*See also* Jeremy Maltby, *Juggling Comity and Self–Government: The Enforcement of Foreign Libel Judgments in U.S. Courts*, 94 COLUM. L.REV. 1978, 1987 (1994)(the Uniform Recognition of Foreign Money–Judgments Act gives a court discretion whether to deny enforcement of a foreign judgment where "enforcement ... would contravene the public policy of the enforcing state"). Under the Act, we may say that, even if the libel cause of action is repugnant to Maryland public policy, we will in the interest of uniform national comity

subordinate Maryland's public policy to First Amendment public policy or a uniform national public policy. We should do so in the instant case. The majority suggests that Maryland case law and public policy is more protective of defamation than the First Amendment; if so, in order to have a uniform national policy regarding enforcement of English libel judgments, we should exercise our discretion not to apply Maryland's unique public policy.

Recognition of foreign judgments, and especially English judgments, has been the subject of treaty negotiations. A convention between the United Kingdom and the United States for the Reciprocal Recognition and Enforcement of Judgments in Civil Matters was held in 1976, but no treaty has yet been ratified. The Supreme Court has not indicated whether federal or state law should govern the recognition of foreign-nation judgments. *See* R. Doak Bishop and Susan Burnette, *United States Practice Concerning Recognition of Foreign Judgments*, 16 INT'L LAW. 425, 429 (1982). Although there is currently no treaty or federal statute preempting the area and most states have assumed enforcement of foreign judgments is a matter that currently can be regulated by the states, we must be cognizant of the foreign affairs implication of comity. The majority acknowledges: "The recognition of foreign judgments is governed by principles of comity." 347 Md. at 573, 702 A.2d at 236. The Supreme Court has given us a definition of comity:

> " 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws."

*Hilton v. Guyot*, 159 U.S. 113, 163–64, 16 S.Ct. 139, 143, 40 L.Ed. 95, 108 (1895). It is clear comity in enforcement of foreign judgments requires two considerations. First, the interest of the individual defendant; and second, the interna-

tional relations between sovereign states. The definition of comity recognizes its obvious international foreign affairs implications. This Court ignores any foreign affairs considerations in its decision, as well as the importance of the attempt to base comity on a uniform national standard. I believe we should answer the certified question by explaining that, even if the English libel judgment might be repugnant to some atypical public policy of Maryland, we would exercise our discretion to subordinate our unique public policy and enforce the English judgment unless to do so violates the United States Constitution, federal public policy, or the uniform public policy of all states.

Since in answering this certified question we are precluded from interpreting the United States Constitution or federal public policy, we should respectfully decline to answer the question. Had this same issue reached this Court by an appeal of the filing of the English libel judgment in Maryland instead of as a certified question, the case would be in a different posture and we could then construe the United States Constitution and what national public policy should be pursuant to the First Amendment. The limitations imposed on us by a certified question proceeding should preclude us from answering the question, and the only issue we can answer, *i.e.*, Maryland's possibly unique public policy, is irrelevant to this litigation.

## MARYLAND PUBLIC POLICY SHOULD NOT PREVENT ENFORCEMENT OF THIS ENGLISH LIBEL JUDGMENT

If this Court had to reach the issue, I believe Maryland public policy should not prevent enforcement of this English libel judgment. Any resolution of whether enforcement of this English libel judgment would violate Maryland public policy should begin with the definition of public policy with regard to enforcement of foreign judgments. A good definition of public policy in the context of recognition of foreign judgments is found in *Milhoux v. Linder*, 902 P.2d 856 (Colo.Ct.App.1995):

"[C]ourts in the United States normally will not deny recognition merely because the law or practice of the foreign country differs, even if markedly from that of the recognition forum. See Hunt v. BP Exploration Co. (Libya) Ltd., supra; Uniform Foreign Money–Judgments Recognition Act S 4 (comment), 13 Uniform Laws Annot. 268 (1986) (A mere difference in the procedural system is not a sufficient basis for non-recognition. A case of serious injustice must be involved.). As Judge Cardozo observed: 'We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home.'

As have numerous other courts, we conclude that an appropriate standard is that set forth in the Restatement (Second) of Conflicts § 117 comment c (1971). Under this standard, the public policy exception is limited to 'situations where the original claim is repugnant to fundamental notions of what is decent and just' in the recognition forum." (Citations omitted).

902 P.2d at 861. See also *Ackermann v. Levine*, 788 F.2d 830 (2d Cir.1986):

"A judgment is unenforceable as against public policy to the extent that it is 'repugnant to fundamental notions of *what is decent and just in the State where enforcement is sought.*' The standard is high, and infrequently met. As one court wrote, '[o]nly in clear-cut cases ought it to avail defendant.' In the classic formulation, a judgment that 'tends clearly' to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property is against public policy." (Citations omitted).

788 F.2d at 841. This libel judgment obtained by one British resident against another British resident was not a "serious injustice"; it does not violate fundamental notions of what is decent and just; and it does not undermine public confidence in the administration of law. Fundamental notions of what is decent and just should also consider that Telnikoff might deserve compensation for Matusevitch's false statements that Telnikoff was a racist and anti-semite who advocated racial

superiority or racial purity, especially since those statements were sent to a newspaper and did substantial damage to Telnikoff's reputation and career. Assessing damages against a private individual, regardless of intent or malice, who wrote a false and defamatory letter that almost ruined another person's reputation should not undermine public confidence in the administration of justice.

For hundreds of years, up until 1964 when the Supreme Court decided *New York Times Co., supra,* the Maryland common law of libel was the same as the current English libel law under which the instant English libel case was decided. *See, e.g., Negley v. Farrow,* 60 Md. 158, 175 (1883). "The fact that one is the proprietor of a newspaper, entitles him to no privilege in this respect, not possessed by the community in general. The law recognizes no duty, imposed on him, arising from his relations to the public, to defame and libel the character of any one, and if he does, it is no answer to say, he did so in good faith, and without malice, honestly believing it to be true." *Negley,* 60 Md. at 177; *see also Domchick v. Greenbelt Consumer Services,* 200 Md. 36, 46, 87 A.2d 831, 836 (1952) (In libel suits, defense of truth must be made by special plea of justification and such plea of justification, if not sustained, "furnishes proof on record of continued malice."). Prior to 1964, there was no public outcry or legislative reaction in Maryland to the same common law applied in the English judgment against Matusevitch. Prior to *New York Times Co.,* this Court saw nothing in the Maryland Declaration of Rights or Maryland public policy that would have led to a decision any different from the English judgment. The *New York Times Co.* decision changed common-law defamation based on the Supreme Court's interpretation of the First Amendment. As one writer noted, "it is sure that *[New York Times Co.]* found defamation a creature of the common law and left it a monument of the First Amendment." Craig A. Stern, *Foreign Judgments and the Freedom of Speech: Look Who's Talking,* 60 BROOK. L.REV. 999, 1011 (1994).

It was only after *New York Times Co.* and its progeny that this Court abandoned hundreds of years of common-law defa-

mation precedent. *See* 347 Md. at 593, 702 A.2d at 246 and cases cited therein. It was not the Maryland Constitution, the Maryland Legislature, public outcry, or Maryland public policy that caused Maryland to abandon its adherence to the English common law of libel in 1964. It was the Supreme Court construing the First Amendment to the United States Constitution that made us jettison the same English common law of libel that we now find so offensive. The change in the Maryland common law was the result of the First Amendment, not the Maryland Constitution, and since we are precluded from interpreting the First Amendment in this action, we should not answer the certified question.

The First Amendment to the United States Constitution provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Article 40 of the Maryland Declaration of Rights differs significantly from its federal counterpart and contains a safeguard against defamation not found in the United States Constitution. It provides:

"That the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, *being responsible for the abuse of that privilege.*" (Emphasis added).

MD. CONST., Declaration of Rights, Art. 40. This provision seems to indicate the drafters of the Maryland Constitution provided for more protection against libel or slander than the First Amendment. Article 40 also established a clear difference between the "liberty of the press," which is inviolably preserved, and the right of every citizen to speak, write, and publish, which leaves the individual responsible for abuse of the privilege. The instant case does not involve "liberty of the press." It is perhaps noteworthy that our freedom of speech

is expressly granted to citizens of this state not to non-citizen residents of England. The majority makes no attempt to explain the differences in the language of the two constitutional provisions and, indeed, somehow concludes that Art. 40 may even give more freedom to defame another person than the First Amendment. There is nothing in the words of Art. 40 that justifies such a conclusion.

If we had to decide the certified question, I believe Maryland's public policy should not preclude enforcement of this judgment. The majority opinion devotes page after page to a stirring tribute to freedom of the press, but this case does not involve freedom of the press. This is a libel judgment obtained by one resident of England against another resident of England. The libel was contained in a letter written by the defendant. Although the letter was published by a newspaper as a letter to the editor, that only increased the damages, the libel was the letter prepared and dispatched by a private person. The letter was libelous regardless of whether the newspaper chose to reprint it. Freedom of the press is not implicated, nor was any United States interest implicated. I trust the majority is not somehow suggesting that it is freedom of speech that protects speaking, but it is freedom of the press that protects printing or writing; that simply is wrong. *See, e.g.,* Craig A. Stern, *Foreign Judgments and the Freedom of Speech: Look Who's Talking,* 60 BROOK. L.REV. 999, 1002 (1994). Article 40 of the Maryland Declaration of Rights also clearly differentiates between the "liberty of the press" and a citizen's right to speak, write, or publish.

Matusevitch's letter was determined to be libelous by a jury; the proceedings were fair and carefully reviewed by the House of Lords, the highest court in England. There is no grave injustice in this internal English litigation. The majority apparently holds that no English libel judgment will ever be recognized and enforced in Maryland; it says, "recognition of English defamation judgments could well lead to wholesale circumvention of fundamental public policy in Maryland and the rest of the country." 347 Md. at 601, 702 A.2d at 250.

The Court uses an oversimplified analysis to reach an overbroad result.

There is another public policy that should also be considered by this Court. That public policy, recognized by our legislature when it adopted the Uniform Foreign Money–Judgments Recognition Act, is to give broad and uniform recognition to foreign judgments. The Act gives our courts discretion to subordinate our State's public policy. Our interest in international good will, comity, and res judicata fostered by recognition of foreign judgments must be weighed against our minimal interest in giving the benefits of our local libel public policy to residents of another country who defame foreign public figures in foreign publications and who have no reasonable expectation that they will be protected by the Maryland Constitution. Unless there is some United States interest that should be protected, there is no good reason to offend a friendly nation like England by refusing to recognize a purely local libel judgment for a purely local defamation. In the instant case, there is no United States interest that might necessitate non-recognition or non-enforcement of the English defamation judgment. As one author noted: "Few cases can be found denying recognition solely on grounds of public policy; when the exception is used, the case almost always involves a choice-of-law concern flowing from the recognizing jurisdiction's interest in the parties or the underlying transaction." Arthur T. von Mehren and Donald T. Trautman, *Recognition of Foreign Adjudications: A Survey and a Suggested Approach*, 81 HARV. L.REV. 1601, 1670 (1968).

Here, Plaintiff and Defendant were both Russian emigres living in England.[2] If England wishes to protect its public figures from even non-negligent libel by private citizens, it

---

**2.** Matusevitch was a Russian citizen and had a Russian passport. He may have also had U.S. citizenship because he was born in New York while his father, a Soviet citizen, was assigned to the Soviet Trade Representation in New York. In 1940, Matusevitch's father was recalled back to the Soviet Union, and Matusevitch accompanied his family back to the Soviet Union when he was four years old. He remained in Russia until he defected in 1968.

should be able to do so. There should be no need for Maryland public policy to give protection to an English resident who libels an English public figure in England. The newspaper article by Telnikoff that provoked Matusevitch's libelous personal attack was a criticism of the British Broadcasting Corporation's (B.B.C.) Russian Service hiring practices. It ended with a statement that: "The author [Telnikoff] was on the staff of the B.B.C. External Services." [3] Matusevitch's defamatory letter referred only to the B.B.C.'s Russian Service recruitment policies and ended with the statement that "[o]ne could expect that the spreading of racialist views would be unacceptable in a British newspaper." There is no United States or Maryland interest implicated by this judgment.

The majority makes the finding of fact that "Telnikoff . . . was undisputably a public official or public figure," 347 Md. at 598, 702 A.2d at 249, but fails to take into account that Telnikoff was not an American public official or public figure. Our Constitution extracts a price for notoriety. American public officials and public figures must realize that if they are defamed there is no redress under our laws unless the defamation is done with malice. This may keep some people from becoming public officials and induce others to shun notoriety, but they generally have that choice. British public officials and public figures, however, expect their law to give them protection from even non-malicious false defamatory statements. We should respect this difference between British public figures and their American counterparts in cases of purely internal English defamation by private persons. I doubt the public would find this as repugnant as does the majority of this Court. Matusevitch, at the time he falsely accused Telnikoff of being a racist hate monger, had no right to, or expectation that he would, be protected by the United States Constitution, and I doubt that the public would be outraged if we do not retroactively bestow our constitutional

---

**3.** The certification order recites that Telnikoff was "an employee of the B.B.C. Russian Service" at the time he wrote the article.

right to non-maliciously defame a public official on Matusevitch merely because he later moves to our country.

The majority cites with approval *Desai v. Hersh,* 719 F.Supp. 670 (N.D.Ill.1989), *aff'd,* 954 F.2d 1408 (7th Cir.1992). In *Desai* the plaintiff was not seeking to enforce a foreign judgment in the United States; he was asking a United States district court to apply foreign libel law to a claim brought in the United States. 719 F.Supp. at 672. The court's analysis was, however, relevant to the instant case when it said:

> "The court concludes that, for purposes of suits brought in United States courts, first amendment protections do not apply to all extraterritorial publications by persons under the protections of the Constitution. Had defendant written a book and published it solely in India concerning plaintiff's activities as a public official in the government of India, but minimally related to a matter of public concern in this country, the need for protection of first amendment interests would be greatly lessened, if not entirely absent. In such an instance, foreign law could be applied here without offending the Constitution.... The first amendment shields the actions of speakers for the benefit of their audience.... To allow the protections of the first amendment to be invoked where the interests it seeks to promote are absent would be to transform the first amendment from a shield into a sword." (Citations omitted).

*Desai,* 719 F.Supp. at 676. The court went on to make a very important distinction, even in cases involving a public figure, between a U.S. publisher or U.S. publication that is distributed in a foreign country which should be given First Amendment protection and a publication directly and intentionally published and distributed solely in another country. In the latter instance there is an abandonment of any First Amendment protection. The court stated:

> "[I]n instances where the plaintiff is a public official or figure and thus heightened first amendment protections, including the 'actual malice' standard, apply to domestic publication, these same protections will apply to extraterri-

torial publication of the same speech where the speech is of a matter of public concern and the publisher has not intentionally and directly published the speech in the foreign country in a manner consistent with the intention to abandon first amendment protections. This principle, being based on conduct within the control of the potential defamation defendant, minimizes any 'chilling effect' resulting from the potential application of foreign defamation law. An author or publisher who does not directly publish in a foreign country can rely on the protections in *New York Times [Co.]*."

*Desai,* 719 F.Supp. at 680–81.

The implication from the majority opinion is that Article 40 of the Maryland Declaration of Rights, as well as the First Amendment, extend to England and protect all English residents who defame other English residents. We should not imply that all English libel judgments violate our public policy as the majority seems to be saying. Instead, the Court should look carefully at the libel judgment at issue and make an individualized determination as to whether enforcement of the foreign judgment would have a chilling effect on First Amendment protection. This is illustrated in *Bachchan v. India Abroad Publications,* 154 Misc.2d 228, 585 N.Y.S.2d 661 (1992), a New York trial court case that the majority calls "the only American case … directly on point." 347 Md. at 600, 702 A.2d at 249. *Bachchan* is not at all on point, but it is a sound decision. The defendant in *Bachchan* was a New York operator of a news wire service that transmits reports to a news service in India. 585 N.Y.S.2d at 661. The defamatory story was written by a reporter in London, wired by the defendant news service to a news service in India where it was picked up by two Indian newspapers who published it and distributed it in England. *Id.* The defamatory story was also published in defendant's publication "India Abroad," which was published and distributed by the defendant in New York, as well as in England. *Id.* The United States wire service was sued in England and a libel judgment was obtained. *Bachchan,* 585 N.Y.S.2d at 661–62. The *Bachchan* case was

decided solely on First Amendment principles and was clearly a correct decision. With border crossing media publications, the United States has a strong interest in seeing that our media will be protected from foreign libel judgments that fail to recognize the American media's freedom of the press. The rationale for the *Bachchan* decision was explained by one commentator as follows:

> "[I]t is not the repugnance of the English law of defamation, but the repugnance of applying it in such a way as to chill speech in New York that is the grounds of non-recognition. The court adumbrates this approach early in its opinion when it substitutes repugnance of the 'judgment' for repugnance of the 'cause of action.'"

Craig A. Stern, *Foreign Judgments and the Freedom of Speech: Look Who's Talking*, 60 BROOK. L. REV. 999, 1031 (1994). Another writer, while praising the result in *Bachchan*, was concerned that its failure to fully explain its rationale would lead other courts into the same error made by the majority in the instant case. His concern was that, instead of recognizing that United States interests were at risk and needed protection in *Bachchan*, other courts might interpret the case too simplistically and use it as authority to refuse recognition of any English libel judgment. He wrote:

> "Despite the 'welcome relief' it provides, *Bachchan* has serious flaws. It does not clearly explain the grounds upon which it is based or the interests it seeks to protect. This lack of concrete reasoning provides unclear precedent for the future and *raises concerns that its rule may be applied too broadly, so as to deny enforcement of any foreign libel judgment that does not conform exactly to the requirements of [New York Times Co.] and its progeny.* *Bachchan* forbids the enforcement of foreign libel judgments that conflict with the values of the First Amendment, but does not spell out what these values are. To follow its command properly, one must identify the interests at stake and determine what will threaten them." (Emphasis added).

Jeremy Maltby, *Juggling Comity and Self-Government: The Enforcement of Foreign Libel Judgments in U.S. Courts*, 94 COLUM. L.REV. 1978, 1982 (1994).

There should be no question about the need for First Amendment protection for a United States news wire service and that enforcement of the judgment in *Bachchan* would chill the free press rights of the New York newspaper wire service. There is a huge difference between giving First Amendment protection to a United States news wire service and giving First Amendment protection (or Article 40 protection) to all English libel defendants. It is unwarranted to simply refuse, on the basis of freedom of the press and Maryland public policy, to enforce all English libel judgments. England has an interest in protecting its residents, including its own public officials and public figures, from even unintentionally false and defamatory statements damaging to their reputation. It should not violate our public policy to recognize that interest as long as it does not endanger our interest in the free dissemination of information by our media and those people shielded by our Constitution. Our national interest might necessitate non-recognition of an English libel judgment if it was a judgment against a United States publication that was circulated abroad, or even perhaps a defamation judgment obtained in a foreign country by a United States public figure who cannot sue for merely negligent or unintended defamation under our Constitutions and public policy. Each case should be examined on its own facts to see if the United States freedom of the press is implicated or if the free speech rights of people entitled to the protection of our First Amendment are implicated.

Public policy should not require us to give First Amendment protection or Article 40 protection to English residents who defame other English residents in publications distributed only in England. Failure to make our constitutional provisions relating to defamation applicable to wholly internal English defamation would not seem to violate fundamental notions of what is decent and just and should not undermine public confidence in the administration of law. The Court

does little or no analysis of the global public policy considerations and seems inclined to make Maryland libel law applicable to the rest of the world by providing a safe haven for foreign libel judgment debtors.